CAMBRIA IRON CO. v. CARNEGIE STEEL CO., Limited.

(Circuit Court of Appeals, Third Circuit. August 21, 1899.)

No. 14.

1. PATENTS—DISCLAIMER.
   A disclaimer, to be effective under Rev. St. § 4917, must be of some material or substantial part of the thing patented, of which the patentee was not the inventor, but which he had previously claimed as new.

2. SAME—INFRINGEMENT—PROCESS OF MIXING MOLTEN PIG METAL—THE JONES MIXER.
   The Jones patent, No. 404,414, claim 2, for a process method of mixing molten pig metal for the purpose of securing uniformity in its constituent parts, preparatory to its further treatment, as limited by the changes made in the application during its pendency in the patent office, does not cover the maintaining of an intermediate receptacle for storage or reservoiring purposes, but is limited to the process of mixing ununiform charges of metal from different furnaces or cupolas, for the purpose of securing uniformity of composition of the charges withdrawn, and it is not infringed by the use of a receptacle into which charges of molten pig iron are run from time to time from different furnaces, and from which the metal is withdrawn, as required for charging Bessemer converters, the primary purpose of which is to furnish a storage receptacle so that the work of Bessemerizing may proceed without interruption, the mixing which takes place therein being only incidental.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 89 Fed. 721.

Francis T. Chambers and James I. Kay, for appellant.

P. C. Knox and Thomas W. Bakewell (Thomas B. Kerr, on the brief), for appellee.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPATRICK, District Judge.

KIRKPATRICK, District Judge. The bill in this case was filed by the Carnegie Steel Company, Limited, appellee, as the assignor of United States letters patent No. 404,414, granted to William R. Jones, June 4, 1889. It charges infringement, and prays for an injunction and account. The defendant, by its answer, denies infringement, and sets up want of patentable novelty.

Prior to the hearing, the complainant's counsel gave notice that he would urge infringement only of the second claim of the patent in suit, and it alone is before the court for consideration. It is as follows:

"(2) In the art of mixing molten metal to secure uniformity of the same in its constituent parts, preparatory to further treatment, the process of introducing into a mixing receptacle successive portions of molten metal, ununiform in their nonmetallic constituents (sulphur, silicon, etc.), removing portions only of the composite molten contents of the receptacle without entirely emptying or draining the same, and successively replenishing the receptacle with fresh ununiform additions, substantially as and for the purpose described."

The patent is for a process method of mixing molten pig metal, and has for its object the procurement of uniformity of the molten metal in its constituent parts, preparatory to further treatment. In order to learn the objects sought by Jones, and the means employed

to attain them, reference must be had to the specification and claim, as well as the file wrapper of the patent. The patent sets out in its title that it is for an improved method of mixing molten pig metal. "It has been found," says the patentee, "that metal tapped from different blast furnaces is apt to vary considerably in chemical composition, particularly in silicon and sulphur, and such lack of uniformity is observable in different portions of the same cast, and even in different portions of the same pig." There is a tendency of silicon and sulphur to segregate, and the consequence "is that the product of the refining process, in the converter or otherwise, in like manner lacks uniformity in these elements, and therefore often causes great inconvenience and loss, making it impossible to manufacture all the articles of a single order of homogeneous composition."

The first claim of the patent relates to the art of refining iron directly from the smelting furnace, but no such limitation is placed upon the second claim, which is now under consideration. The process therein claimed applies to "the art of mixing molten metal." By the use of the more general term, "molten metal," it seems to us that the inventor intended to and did broaden his claim so as to include in it the treatment of all molten metals, whether drawn from furnace or cupola. The natural meaning of the words "molten metal" would require that construction, and it appears from the record that it is in accordance, not only with the definition of the words furnished by scientific lexicographers and those skilled in the art, but also with the understanding of the inventor himself. In the application for a patent upon the apparatus adapted to carry out the process of the patent in suit which was filed in the patent office on the same day, Jones says: "The main feature of the present invention is, broadly, a covered preliminary receiving vessel for holding and mixing the charges of molten metal which are supplied thereto, either from a blast furnace or cupola." The tendency of silicon and sulphur to segregate themselves in molten metal is equally observable in that drawn from cupola and furnace. In both it causes the same inconvenience and loss, rendering the product of the subsequent refining processes lacking in a uniformity in these elements, and in consequence possessing a variable tensile strength. Neither can the object of the Jones invention be limited to the uniforming molten metal preparatory for its use in the Bessemer converter. The words of the claim and the specification both forbid. In the claim the inventor says he has a process which in the art of mixing molten metal will secure uniformity of the same in its constituent parts preparatory to further treatment. These words are broad enough to include a puddling furnace, an open hearth, or any treatment to which molten metal is adapted in the art, and in which it is desirable to have uniformity in its constituent parts. In the specification he declares that his object is to provide means for "rendering the product of steel mills uniform in chemical composition."

Uniformity of product is to be obtained by uniformity of the molten metal required in its manufacture. Particularly, but not exclusively, would this be true of the steel made by the Bessemer process. All the manufactured articles would be of a single order of

homogeneous composition by the elimination of the lack of uniformity in the elements of silicon and sulphur from the molten metal. It does not seem to us that the complainants limit the claim of the patent in suit by the disclaimers which they have filed. In our opinion, they do not modify or change the construction of the claim as originally granted. They do not disclaim anything. Their avowed purpose is "to limit the scope of the letters patent to the mixing of molten metal preparatory to further treatment." This we find to be the limit of the patent as originally granted. The disclaimers, therefore, do not comply with the statutory requirement that the patentee shall give up some material or substantial part of the thing patented of which he was not the original inventor. If we examine the eliminated parts of the specification, we find that they relate (1) to an example of a way in which the mixture of the molten metal may be made, and which is only one of the obvious varieties of form in which the invention may be practiced, and (2) the uses to which the mixed metal may be put in the art after the patented process has been completed. Neither of the matters erased affects the process or method of mixing molten pig metal which was the subject-matter of the patent, nor do they affect anything of which Jones claimed to be the original and first inventor. They do not, therefore, come within the limits laid down by the supreme court in Union Metallic Cartridge Co. v. United States Cartridge Co., 112 U. S. 624, 5 Sup. Ct. 475, where, speaking by Mr. Justice Blatchford, they say: "The statute expressly limits a disclaimer to a rejection of something before claimed as new."

In seeking to find out what was new in the complainant's process, and what it was he sought, we will be aided by an examination of the file wrapper. By reference to it, it will appear that the function ascribed by Jones to his intermediate receptacle was one of storage as well as mixing to a uniform standard. In the application as originally filed, the "main feature of the invention" was the "method of storing successive charges of molten metal in a receptacle before using it in converters or otherwise," and the invention claimed was the described process "whereby the character of the charges of metal so treated is equalized." The application was rejected by the patent office examiner as being completely anticipated by United States patent No. 315,587, to Witherow, April 14, 1885, and patent No. 327,425, to Witherow, September 29, 1885, as well as "Kirk's Founding of Metals. New York: 1881." Both the Witherow patents claim the combination of a blast furnace with an intermediate storage receptacle between furnace and converter, with a ladle to receive and convey to the converter a proper charge of the molten metal, while Kirk sets out the function of a large intermediate reservoir, to be used in the mixing of molten metal drawn from a cupola. In this finding of the patent office the applicant acquiesced. He made certain erasures in the specification, and substituted for the objectionable claim one which read as follows:

"The process hereinbefore described, which consists in running successive charges of molten metal into a covered receptacle provided with a heat-retaining lining, removing from time to time from said receptacle for subsequent

treatment a portion only of its molten contents, and successively replenishing such receptacle with fresh additions of molten metal for the purpose of equalizing the character of the several charges of metal drawn therefrom, substantially as described."

It will be noticed that the new claim is silent as to the storage function of the receptacle, and in the argument filed with the patent office commissioner the applicant declared that the idea of the Witherow patents was "to receive and store the molten metal for the purpose of preventing detention" in practical working, and not to mix the metal gradually, and that in those respects it differed from the Jones application, where the "distinctive idea was to have a receptacle capable of holding metal in molten condition, into which metal, it may be from several blast furnaces, is run from time to time, and from which metal is drawn for treatment in the converter or otherwise, as required. This continual pouring into and drawing out of a common receptacle produces such a mixing of the charges as results in a uniform average quality of metal, whether treated in the converters, or used for casting without such treatment, as is very desirable, and has been hitherto found to be practically unattainable." Again the application was rejected at the patent office. The Witherow references are withdrawn, no doubt because the storage function of the reservoir did not necessarily result in the mixing of the metal to the uniform average quality sought by the applicant. The patent office, however, again refers to the description of the Kirk method of metal founding above noted, which states that "the metal is run continuously from the cupola, and mixed in the ladle, from which it is tapped into small ladles." "The iron is all run out of the cupola as fast as it is melted, and is mixed in the large ladle." References are also made to British patents No. 859, Bronan, March 23, 1866, and No. 2,382, Stewart, May 10, 1883. Again, the specifications and claims of the patent are amended, and now made to conform to these set out in the patent in suit.

Quite a transformation has taken place. The storage and reservoiring features have been eliminated, the mixing has become predominant, and, in order that the mixing may be differentiated from that described in the Kirk method, it was to be mixing "whereby its particles are diffused or mingled thoroughly among each other, and the entire charge is practically homogeneous in composition, and the product of the further treatment of the metal of a single order of homogeneous composition." Because the claims of the patent as granted so far differed from those set out in the original application, an affidavit of Jones was annexed, in which he says that "the invention has been found of great practical value in securing uniformity in the product of steel works, and thus rendering the same more certain in character and more valuable commercially."

In what respect, then, does this new claim differ from the one which had been rejected by the patent office examiner and from the Kirk method of founding, to which reference had been made? Only in this: Kirk's method of mixing was that which resulted from pouring the successive casts of one cupola into a reservoir, while the Jones method provided for the mixing, not merely of metal taken at

one time from the smelting furnace, but of a number of parts taken from different furnaces at different times. In this way, says the patentee, each charge represents an average of a variety of uniform constituent parts, all the charges of the converter will be substantially uniform, and the product of all will be homogeneous. Mr. Carnegie testifies on the record that the "soul of the Jones invention is the law of averages,—the dealing with successive small portions of metal, which may be selected at the blast furnace or the mixer"; and again declares its "essence to be that the appliances invented by Jones enable successive portions of metal to be combined according to their respective constituents, and this over a number of portions large enough to secure the uniform standard necessary." Should the metal sent from any furnace be at that time unsuitable for combination with that of other furnaces, it may be rejected by the superintendents. In the Kirk method there was no selection of metals; there was no drawing from many furnaces or cupolas to obtain, by the law of average, a uniform standard. There was no effort to obtain such a mixture of suitable metal as in combination would produce a standard quality.

These were the objects sought by Jones, as we, by the aid of the record and file wrapper, read the claim and specification of the Jones patent now in suit. What process, then, did Jones devise to attain these ends? It consists of introducing into a mixing receptacle successive portions of ununiform molten metal, and removing portions thereof, without entirely draining or emptying the same, and successively replenishing the receptacle with fresh ununiform additions. The quantity which shall remain in the receptacle is stated to be a "considerable quantity." Beyond this vague description, the specification of the patent is silent. We find nothing in the patent which warrants us in determining that the inventor had in mind that the residue to be left in the receptacle should form a dominating pool. The residue, composed of parts of previous charges, mixes with the new portions which are poured in, and thereby the molten metal becomes practically uniform in chemical composition. This uniformity was to be attained, not so much by the pouring into the reservoir metal obtained at several times from one furnace, but by a number of parts from different furnaces. The stipulation entered into between counsel shows the manner in which the defendant uses what is alleged to be the infringing device. It is as follows:

"That the defendant in this case has used the mixer and other apparatus shown in blue prints, complainant's Exhibits Nos. 1 and 2 of defendant's mixer, together with blast furnaces at Johnstown, Pa., since date prior to the commencement of this suit, and at various times since that date, in the manner following: That is to say, the molten pig metal has been tapped from the several blast furnaces, four or five in number, and poured into the mixer, which has an actual capacity of about two hundred and eighty tons, additions to this molten metal from the blast furnaces being made from time to time to the mixer in quantities of about fifteen tons, as it is tapped from the blast furnaces; and that the molten metal in the mixer has been discharged by tapping the mixer from time to time, and as required for charging the Bessemer converters, into ladles having a capacity of about fifteen to eighteen tons each, the charges withdrawn being from about eleven to twelve tons each; that the amount of molten metal in said mixture varies from nothing to its

full capacity, depending on the supply and demand, the supply being generally sufficient to keep the mixer more than half full of molten metal, which metal remains molten therein; that the molten contents of the mixer are drawn off from time to time, as required for the converters, the converter charges being from eleven to twelve tons each, as above stated, the metal being charged into the converters in a molten condition, and sometimes a smaller portion being withdrawn from the mixer, and the remainder of the molten metal for the charge being run into the ladle containing the mixer metal from cupolas forming part of the converter plant, the combined charge of mixer metal and cupola metal being introduced into the converter and refined in the usual manner."

The record shows that the defendant's reservoir or accumulating ladle complained of is the same in principle as one which has been in use at the Cambria works ever since Bessemer steel was first manufactured there, with only this difference: that at first it was used at cupola, now at furnace. The primary object has always been to permit the work of Bessemerizing to proceed without interruption, to furnish a receptacle for the molten iron of the cupola or furnace when it was most advantageous to tap the same, and thereby avoid a too early tapping as well as the necessity of being obliged to hold too long. It is stipulated that the amount of molten metal ordinarily kept in the reservoir is more than one-half its capacity, but that it varies from nothing to its full capacity, depending on the supply and demand. Doubtless, under the ordinary conditions, there is a mixing of the molten metal when the partially filled vessel is replenished, but it is only such mixing as is incidental to the pouring together of mixable liquids under the well-known principle of diffusion. As we have said, the Jones patent was not for the storage or reservoiring of metal drawn either from furnace or cupola nor the mixing incidental thereto. The patentee had acquiesced in the finding of the patent-office examiner that, as to these matters, he was anticipated by the Witherow patents and Kirk's publication. If the defendant's reservoir carries with it, by well-known natural laws, incidental mixing, it cannot be regarded as an infringement of the patent in suit, unless, in addition to its function as a reservoir, it has in combination some additional element set out in complainant's process. If it be urged that the defendant, by drawing from several furnaces the molten metal required to replenish its reservoir, thereby obtains the average of uniformity sought by complainant's process, the answer is that in this respect the complainant's patent is anticipated by the British patent to Deightom, No. 3,672, May 7, 1874, whose claim of invention was the placing of a vessel so as to "receive the molten metal tapped from two or more blast furnaces, to get a better average of metal, which will be more suitable for making Bessemer steel or metal of uniform quality." For these reasons we are of the opinion that the defendant's device does not infringe the second claim of the patent in suit. The decree of the circuit court is reversed, and the case is remanded to that court, with directions to dismiss the bill of complaint.