BRACEWELL v. PASSAIC PRINT WORKS.

(Circuit Court, S. D. New York. March 19, 1901.)

1. PATENTS—DISCLAIMER—PROCESS PATENT.
Where a patent covered a process relating to the printing of a cotton cloth, a disclaimer limiting its application to patterns produced by the use of certain classes of dyestuffs is a proper and valid one, under the statute, where, through inadvertence, accident, or mistake, the original specification and claims were broader than the invention of the patentee. Such disclaimer is, however, an implied admission that, except as applied to the classes of dyes retained, the process was a part of the prior art; and it may render the patent invalid as to such dyes unless there is some statement in the specification which differentiates the process as applied to them, in a patentable sense, from the same process when used in connection with other colors or dyes.

2. SAME—INSUFFICIENCY OF SPECIFICATION—PROCESS FOR CALICO PRINTING.
The Whitehead patent, No. 499,689, for an improvement in aniline-black resists, which, as limited by a disclaimer filed subsequent to its issuance, relates to the production of colored patterns in cloth on an aniline-black ground, the gist of the invention claimed being the employment of a "zinc compound" as the essential or active element in the resist, is void, because the specification fails clearly to describe and distinctly to claim the process, within the requirement of the statute, and for the further reason that, as described and claimed in general terms, the process was anticipated by prior use.

3. SAME—SPECIFICATION AND CLAIMS—LIMITATION BY CONSTRUCTION.
After claiming a process so broadly that it is met by the prior art, and after the process, practiced by following a certain formula, has gone into general use, the patentee cannot so limit his claim as to cover that formula, unless it be clearly described in the specification, and the claim be susceptible of an interpretation including it.

In Equity. Suit for infringement of patent. On final hearing.

Edwin H. Brown and Charles S. Jones, for complainant.
George L. Roberts, for defendant.

COXE, District Judge. This is an action for infringement of letters patent, No. 499,689, granted June 13, 1893, to William T. Whitehead, as inventor, and Henry D. Dupee, as assignee of one-half interest, for an improvement in aniline-black resists. The patent is now owned by the complainant. The application was filed January 16, 1893. A disclaimer was filed by the complainant August 21, 1894.

### The Patent after Disclaimer.

Omitting the portion disclaimed the specification reads as follows:

"My invention relates to the production of colored patterns in cloth by a resist on an aniline-black ground, and has for its object the method of producing cloth having colored patterns on an aniline-black ground, substantially as will be described. Heretofore, in slop-padding or dyeing aniline-black goods and printing thereon a color discharge, great difficulty has been found in preventing too great an oxidation of the black, before the printing on of a pattern or figure, overoxidation making the production of a clear-cut pattern or figure impossible. I have overcome this difficulty by first printing the cloth in a color resist, as hereinafter described, then slop-padding or dyeing the goods in the aniline-black liquor and suitably drying the cloth. My invention is equally well adapted for the production of colored patterns, by mixing coal-tar colors, or extracts of dyewoods, with the resist, in about the proportions hereinafter set forth. The shade may be produced from a coal-tar color, as for instance, I may take six pounds of a zinc compound; one and one-eighth gallons of water; nine ounces safranin; and one and one-half pounds of starch, and thoroughly mix and boil. If other coal-tar colors are desired, Bismarck brown, methyl blue, malachite green, oxyphenin, chrysamin, methyl violet, or any one of the coal-tar colors having the property when used in combination with a zinc compound of fixing itself to the fabric, may be employed. I have found in my experiments that most of the so-called basic colors will fix properly with zinc compound, but some of the acid colors, such as soluble blue and violet and acid magenta, fail to properly fix with the oxide and produce good results. If the color is to be produced from dyewood or berry extract, I may take, for instance, six pounds of a zinc compound; one and one-half gallons of water, and thoroughly mix. Then I take three pints Persian berry extract, 48° Twaddle, and add the proper amount of starch to produce a good impression on the cloth, and to this I add one pint chrome acetate, 32° Twaddle, and mix all well together. The quantity of Persian berry is varied according to the shade desired. For other colors extracts of logwood, sapan, fustic, quercitron, bark, etc., can be used in place of the berry liquor, in varying proportions according to the shade desired. While I have particularly specified oxide, hydrate and carbonate of zinc under the term zinc compound, I do not desire to be restricted to the same, for while oxide of zinc is preferred by me for general use any zinc compound may be employed with good results. Nor do I confine myself to the exact stated quantity of zinc. The gist of my invention lies in the employment of a zinc compound, as the essential or active element, as stated, in a resist.

"I claim—

"(2) In the herein described process of producing cloth having colored patterns on aniline-black grounds, printing the pattern upon the cloth in a resist containing a zinc compound as its essential or active element, and a color, suitably drying the cloth and thereafter treating the cloth with a solution of aniline-black by blotching, slop-padding or dyeing, substantially as described."

The first claim is entirely exscinded.

The disclaimer closes with the following statement:

"He hereby limits the word 'color' in line 52 of the second claim to coal-tar colors or dyewood extracts such as are referred to in the present disclaimed specification."

The suit was commenced August 18, 1898. The bill as filed alleged infringement of another patent which, however, was withdrawn at the hearing.

### Defenses.

The defenses are ambiguity of the specification and lack of novelty and invention. Infringement is admitted.

## The Disclaimer.

The disclaimer was filed for the reason, stated therein, that through inadvertence, accident or mistake the specification and claims of the patent were too broad. The patent as granted covered white and pigment colored patterns; the effect of the disclaimer is to limit it to patterns produced with certain coal-tar colors and dyewood extracts. There is no pretense that Whitehead, by the original specification, intended to defraud or mislead the public or that the disclaimer was unreasonably delayed. No new supplemental description is required to make the present claim intelligible.

This court had occasion to examine the law of disclaimers in Electrical Accumulator Co. v. Julien Electric Co. (C. C.) 38 Fed. 117, 133–137. It is unnecessary to repeat what is there stated. In addition to the authorities there cited the recent case of Thompson v. N. T. Bushnell Co., 37 C. C. A. 456, 96 Fed. 238, is applicable to the present situation. The disclaimer becomes part of the original specification and must be considered in construing the patent and considering the rights of the parties. The disclaimer is conclusive evidence that the owner of the patent is not entitled to the subject-matter disclaimed and it is, at least, prima facie proof that the device or process thus relinquished was old when the patentee made his contribution to the art. Matters disclaimed are no longer a part of the invention and the patent must be construed as if such matters had never been included in the specification. Dunbar v. Myers, 94 U. S. 187, 193, 194, 24 L. Ed. 34. The court is unable to perceive why the disclaimer is not a proper and valid one. In short, were this action pending upon the original patent and it should now appear that the process as practiced with the coal-tar colors or dyewood extracts referred to was new and useful and the result achieved was a distinct improvement in the art of color printing on cloth, would it not be the duty of the court to permit the complainant to disclaim what Whitehead did not invent if necessary to enable him to hold what Whitehead did invent? The effect of the disclaimer is to narrow the alleged invention and although it may be conceded that the disclaimer was properly filed the question remains whether, in view of its express and implied admissions and the achievements of other experimenters along similar lines, the patent in its present form describes and covers a patentable invention. In view of what others are proved to have done and in view of what Whitehead, by implication, admits that others had done prior to his application, did his contribution to the art rise to the dignity of invention? This question it would seem can be discussed more appropriately under the head of invention than under the head of disclaimer.

## The Patent in Suit.

The Whitehead patent is for an improvement in aniline-black resists. The process of the second claim relates to the production of colored patterns on an aniline-black ground.

Aniline-black was invented by John Lightfoot in 1863. Aniline is a coal-tar product which is transformed into aniline-black by a

process of oxidation. Since 1863 various excitants of oxidation have been used, those principally employed being the copper sulphide, the copper sulphocyanide, the vanadium and the prussiate. After the aniline-black mixture is applied to the cloth the black color is developed by subjecting the cloth to a warm and moist atmosphere. The time required to accomplish this result has, by the aid of machinery and by subjecting the cloth to .the action of steam, been reduced from several hours to less than two minutes.

### The Process of the Second Claim.

By the process of the patent colored patterns are printed so that they stand out sharply and distinctly upon the black background thus produced. Prior to the patent patterns had been printed upon cotton cloth in both resist style and discharge style. The patent deals with the former and it is alleged that the Whitehead process produces clearer and brighter effects than any which preceded it. As the claim is interpreted by the complainant the process consists of the following steps: First. The white, bleached, unmordanted cloth, without any preliminary treatment, is printed with a color consisting of oxide of zinc and a basic aniline color together with the requisite thickening paste. Second. The cloth is slop-padded with a solution of prussiate aniline-black. Third. It is passed through a pair of squeezing rollers. Fourth. It is dried by means of drums heated by steam. Fifth. It is passed through the aging machine which develops the black. Sixth. It is soaped, dried and finished as desired.

### Construction of Description and Claim.

If the foregoing be a correct interpretation of the claim it must be conceded that the patentee was most unfortunate in the language employed. The patent has been justly criticised in many particulars, but the criticism has been so persistent and has dealt with such minute and, at times, unimportant details that the court has been at a loss to know to what defense many of these inaccuracies are directed. Some of the accusations are inconsequential and indeterminate, and no conclusion is or can be based thereon. No attempt to defraud the public being alleged or proved the inquiry regarding the sufficiency of the specification must be confined to the question whether the description of the invention is stated "in such full, clear, concise and exact terms as to enable any person skilled in the art" to compound and use the process. Rev. St. § 4888. In determining this question the rule must not be lost sight of that the patent is not addressed to rhetoricians or verbalists, but to the workers in the art—in this case to calico printers. Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860; Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177. It should also be remembered that this is a rule of construction and not of reconstruction and does not warrant the substitution of inference and imagination for the plain statement required by law.

### Prussiate Aniline-Black.

Prussiate aniline-black was first described by Prud'homme in 1884. It consists of aniline salts, potassium or sodium chlorate and potassium or sodium ferrocyanide. The complainant's theory is that as

prussiate aniline-black is the only one which will react with a zinc oxide resist to produce zinc ferrocyanide, therefore prussiate aniline-black and no other was intended by the patentee. Zinc ferrocyanide is not itself a resist against aniline-black, but it is an efficient mordant for basic coal-tar colors. It is asserted that calico printers would know that the patentee referred only to prussiate aniline-black. The complainant further asserts that since 1884 it has commercially and practically supplanted the other aniline-blacks and was almost exclusively used in the prior art when a color discharge was printed upon goods which had been slop-padded in aniline-black. Whitehead, it is argued, was trying to improve upon known processes, by printing a resist under, instead of a discharge over, slop-padded aniline-black. He took the prior art as he found it so far as the aniline-black solution was concerned; he was not attempting to alter or improve the solution which was then in general, if not exclusive, use. The changes introduced by him related, it is said, not so much to the sequence of the steps as to the ingredients of the resist, and, so far as slop-padding is concerned, he was justified in assuming that the skilled workmen who had for years used the "Prud'homme black" would know what he meant. On the other hand it is conceded that there were, at least, three other aniline-blacks which were in practical commercial use prior to the application. These were invented by Lauth, Higgins and Lightfoot and it was possible to use them for blotching and slop-padding.

In these circumstances the first question which naturally suggests itself is, if the patentee intended prussiate aniline-black, why did he not say so? In the original specification "an aniline-black" or equivalent terms are used 18 times and there is not a word to indicate that one is given preference over the others. In the part stricken out by the disclaimer the patentee says, for instance:

"The printed fabric, in order that it may have an aniline-black ground or body, is then either blotched, printed, slop-padded or dyed in a solution of aniline-black produced by any of the recipes well-known to calico printers or dyers, dried in the usual manner, and thereafter the aniline-black is developed by passing the fabric through an aniline aging machine, or by steaming, with or without pressure."

The complainant construes this as though it read "a solution of prussiate aniline-black produced by any of the recipes for making prussiate aniline-black well known to calico printers," etc. But such a construction simply puts the English language to the torture.

At the date of the invention very many resists had been used which were effectual against all varieties of aniline-black. There can be no doubt that long before the patent vanadium aniline-black blotch printing had been done, which is one of the alternative methods referred to in the patent. One of the defendant's witnesses, a practical man, testified:

"I know of no style of calico printing produced at the present day which might not be produced were there no such black as prussiate black, or for which vanadiate black might not be employed."

This statement is substantiated by the other testimony and by the prior literature on the subject. That prussiate aniline-black was the

most popular and dominated the other varieties at the date of the patent is clear, but it is also true that the others might be used, and were used, and that the language of the specification and claim is broad enough to cover all then in use or which may hereafter be produced. It is highly probable that both Reoch and Walsh would have been misled by the patent and would have used vanadium aniline-black in attempting to practice the process and so would other printers who were not in the habit of using the prussiate black. Were the uncertainty and ambiguity of the patent in this regard its only fault, if it were clear and specific in other important particulars it is possible that this difficulty might be surmounted, but the other portions of the specification afford no relief.

### Zinc Compound.

The essential feature of the process is the use of a zinc compound as the active element in the resist. The oxide of zinc when used in the process performs the double function of acting as a resist for the aniline-black and as a base of the fixing agent which fixes the color to the cloth. Oxide, hydrate or carbonate of zinc seem to be regarded by the complainant as indispensable to the patented process. In this connection it must be remembered that Whitehead, neither in the description nor in the claim, confines himself to zinc oxide or any particular form of zinc solution. He prefers oxide but distinctly asserts that he is not restricted to the same and that any zinc compound may be used, and that he is not confined to the exact quantity of zinc specified. The claim speaks of "a resist containing a zinc compound." It is plain, then, that in this process a resist containing any zinc compound as its essential or active element will infringe, and if used before will anticipate. Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81, 37 L. Ed. 1059. It is proved beyond contradiction that there is a large number of zinc compounds, that few of them are capable of acting as a resist against aniline-black and that whether they will so act or not can only be determined by experiment and cannot be known in advance. The statement that "any zinc compound may be employed with good results" is incorrect and misleading. Plainer language could not be used to convey the idea that the patentee intended to claim broadly a zinc compound and that the employment of a zinc compound as the essential element in a resist is the principal feature, or, as he expresses it, "the gist" of the invention. The expert witnesses, all chemists of wide experience, agree that an untried zinc compound could not be used in the Whitehead process with any certainty that it would operate successfully as a resist against prussiate aniline-black. For instance, neither zinc sulphide, which chemically resembles zinc oxide, nor zinc chloride will operate successfully while zinc acetate will do so. How is a calico printer to know what zinc compound will operate and what will not? It will not do to say that zinc oxide is mentioned preferentially and that the skilled operator naturally will seek no further; for the reason that the patentee has seen fit to claim all zinc compounds broadly and the claim cannot now be limited to the particular compound with which he has chosen to illustrate his method. Complainant proceeds upon the theory that the

broad statement though erroneous is immaterial, because the skilled calico printer will use the oxide and make no further experiment. The difficulty with this contention, assuming the fact to be well stated, is that Whitehead not only asserted that any zinc compound would give satisfactory results, but he has claimed all zinc compounds as broadly as possible in the claim. There is no ambiguity or room to doubt what he intended to do or what he actually has done. There is no room for interpretation when the language used is perfectly clear and distinct. To draw an analogy from another branch of the case previously discussed. If Whitehead had said, "I have specified prussiate aniline-black, copper sulphide aniline-black and vanadium aniline-black, but I do not desire to be restricted to these as any aniline-black may be employed with good results," it is thought that the complainant would hardly then contend that the claim could be restricted to the first named, because subsequent experiments proved it to be the best. The court is unable to perceive how the situation is aided by what practical calico printers might do if the patentee had not made the broad statement and claim referred to. To prove that these printers knew by intuition that a large number of zinc compounds would not operate successfully tends to convict the patentee either of a deliberate falsehood or of amazing ignorance. Here, again, the question arises, why did not the patentee describe and claim zinc oxide, if he knew that the success of his process depended upon its use? It cannot be contended that the patentee knew that his statement that any zinc compound would operate successfully was false, but it is manifest that he did not know that it was true and he should have known that it was true before he inserted it in his description and made his corresponding claim. He stretched his net to catch as infringers all users of zinc compounds and if he has stretched it to the breaking point he has only himself to blame. The courts should be liberal in construing patents, but they cannot rewrite the description and claims, they cannot construct an entirely new patent even to save a meritorious invention. If the complainant's contention be correct a patentee can claim blindly an entire group of compounds relying on the court, after subsequent investigation and experiment, to limit the claim to the one which gives the best results. This will not do. In Sewall v. Jones, 91 U. S. 171, 185, 23 L. Ed. 275, 278, the court says:

"The omission to mention in the specification something which contributes only to the degree of benefit, provided the apparatus would work beneficially and be worth adopting without it, is not fatal, while the omission of what is known to be necessary to the enjoyment of the invention is fatal."

### Zinc Ferrocyanide.

It is necessary that the coloring matter should be fixed upon the cloth. This is accomplished when zinc oxide and prussiate aniline-black are used, by zinc ferrocyanide, a residual zinc compound which operates not as a resist but as a mordant for some of the designated colors but not for all. The complainant contends that this mordant forming function produced from the union of zinc oxide and prussiate aniline-black is an essential element of the Whitehead process.

The formation of a mordant in the manner suggested is not mentioned in the specification. The words "mordant" and "ferrocyanide" are not found there. The following language of the specification contains all there is bearing upon the subject and from it entirely antagonistic conclusions are drawn:

"If other coal-tar colors are desired, Bismarck brown, methyl blue, malachite green, oxyphenin, chrysamin, methyl violet, or any one of the coal-tar colors having the property when used in combination with a zinc compound of fixing itself to the fabric, may be employed. I have found in my experiments that most of the so-called basic colors will fix properly with zinc compound, but some of the acid colors, such as soluble blue and violet and acid magenta, fail to properly fix with the oxide and produce good results. If the color is to be produced from dyewood or berry extract, I may take, for instance, six pounds of a zinc compound; one and one half gallons of water, and thoroughly mix. Then I take three pints Persian berry extract, 48° Twaddle, and add the proper amount of starch to produce a good impression on the cloth, and to this I add one pint chrome acetate, 32° Twaddle, and mix all well together."

And the following which was disclaimed:

"Usually where a color is added to the resist mixture, the color may be still further fastened by the addition of albumen to the mixture in such quantity and proportion as the nature of the particular case may make necessary or advisable."

The failure to mention the usual mordants for basic coal-tar colors and the statement that most of these colors will fix properly with zinc compound furnishes the strongest ground for the complainant's argument that calico printers would know that zinc ferrocyanide is formed by the process of the patent. But is this the full and distinct statement required by the statute? It will be observed that the patentee does not say that all of the basic colors will fix properly, but that "most" of them will do so. If most of them will fix it is a fair inference that some of them will not fix. Which are the basic colors that will fix and which will not fix? When a basic color is discovered that will fix properly with a zinc compound how is the result produced? Is it by the use of zinc oxide? The specification does not so say. Is it by the use of prussiate aniline-black in conjunction with zinc oxide? Again the specification is silent. The calico printers are also informed that some of the acid colors "fail to properly fix with the oxide and produce good results." Here, again, a fair presumption arises that if some acid colors fail others will succeed, but which fail and which succeed? If the color to be produced is from dyewood or berry extract the use of chrome acetate is specifically recommended as a mordant and it is stated that "usually" where "a color" is added to the resist it may be still further fastened by the addition of albumen. It is contended that the use of albumen is suggested with reference to pigment colors, but the specification does not so say. It is also argued that the chrome acetate is merely suggested for fastening still further the coloring matter, but the recipe above quoted will be searched in vain for a suggestion of this kind. Prior to the application it is said the use of a mordant was universal for basic coal-tar colors and the mordants usually employed were well known to calico printers, the one usually employed being tannic acid. In failing to mention

these did the patentee intend to inform the art that he had discovered a substitute for their use, or did he expect that the skilled printers would continue to do what they were accustomed to do? When he stated that he had found that most of the basic colors would fix with zinc compound did he mean with a zinc compound alone or in conjunction with the usual mordant? If he had discovered the important fact that his process dispensed with the usual fixing agents should he not have stated it plainly? The essential feature upon which an invention rests should not be left to conjecture and inference. To paraphrase the language of complainant's brief in dealing with an article written by Ferd. Oswald it may be said that "there is absolutely nothing in the 'patent' which would suggest the use of an agent which performs the double function of resisting the aniline-black and of ultimately forming a mordant for the coloring matter associated with such agent." Whether or not zinc ferrocyanide is a mordant for pigments, dyewood extracts and Persian berry is stoutly asserted on one side and as stoutly denied upon the other. It probably exerts some fixing action, but it is conceded that it is not commercially satisfactory and that other fixing agents produce more successful results. There seems to be no dispute that zinc ferrocyanide can only be formed when prussiate aniline-black is used. It is not a resist against prussiate, or any other, aniline-black. It is a residual product appearing after the resisting function has been accomplished. In other words, it begins its work after the work of the resist is ended.

### The Prior Literature.

As before stated the attempted effect of the disclaimer is to limit the process to the production of colored patterns by the use of basic coal-tar colors, the two substantive colors, chrysamin and oxyphenin and Persian berry and dyewood extracts. By implication, at least, the process was admitted to be old when used for the production of white or pigment colored patterns.

The first claim, relinquished by the disclaimer, is as follows:

"(1) In the herein described process of producing cloth having patterns on aniline-black grounds, printing the pattern upon the cloth in a resist containing a zinc compound as its essential or active element, suitably drying the cloth, and thereafter treating the cloth with a solution of aniline-black by blotching, slop-padding, or dyeing, substantially as described."

The presumption as above-stated seems to be overwhelmingly supported by the proof and the court understands it to be conceded by the complainant.

Kertesz, in 1888, and Noelting and Lehne, in 1892, publish recipes for resists against any aniline-black, in which zinc oxide is named as one of the resists. Kertesz says:

"All alkalies are pre-eminently capable of acting as reserves against aniline-black. If, for example, we print caustic soda thickened with British gum, and over it pad aniline-black, then we obtain, after the usual cleansing, white figures upon black ground. This result, however, at the present time, is better produced by discharge upon aniline-black. Furthermore, there can serve as reserves, calcium acetate, sodium acetate, sodium aluminate, sodium arseniate, zinc oxide, and very especially sulphocyanide salts."

Noelting and Lehne give a recipe for a white discharge in which the resisting agents are zinc oxide, sodium acetate and caustic soda. It is not thought necessary to examine the prior literature more in detail, for the reason that it seems to be conceded that the prior publications do not anticipate if the patent be construed to cover a process in which the zinc compound acts both as a resist and to produce a mordant and on the other hand it seems to be conceded that the patent is invalid unless so construed.

### The Manchester Prior Use.

In the summer of 1892 the Manchester Print Works manufactured for the market about 1,200 pieces of calico prints containing buff and pink colored patterns produced by the use of a resist paste of zinc oxide, caustic soda and a substantive coal-tar color slop-padded with a solution of prussiate aniline-black. In this process a zinc compound was employed which the patentee says is "the gist" of his invention, and not only so but the resist contained zinc oxide to which the specification particularly refers. The aniline-black solution was the prussiate, which it is asserted the specification, by implication, points out as necessary to a successful working of the process. Moreover, chrysamin, one of the coal-tar colors mentioned by the patentee, was mixed with the zinc oxide resist. It is clear that this process anticipates the claim unless the presence of caustic soda in the resist paste prevents this result. It is contended that the formation of zinc ferrocyanide is essential to the process of the patent, although no direct mention thereof is found in the description or claim, and that the presence of caustic soda in the Manchester paste prevents the formation of zinc ferrocyanide. Unless, then, the patent can be so construed as to include the formation of zinc ferrocyanide which requires the presence of zinc oxide, hydrate or carbonate and also prussiate aniline-black, the Manchester use would seem to be a complete anticipation. It is said that the Manchester printers were ignorant of the chemical resisting power of zinc oxide and of the formation of a mordant. Although in another portion of the complainant's brief, in order to prove the knowledge possessed by the patentee upon this subject, it is asserted:

"Notwithstanding the fact that the patent did not mention zinc ferrocyanide as the particular mordant which results from his directions to use zinc oxide and prussiate aniline black, it is apparent to any one having the slightest knowledge of chemistry that such a mordant would be formed."

It is argued that the caustic soda in the Manchester resist in combination with a portion of the zinc oxide formed sodium zincate which was the only chemical resisting agent against the aniline-black and that the formation of zinc ferrocyanide in such conditions is impossible. There is, however, no dispute that the sodium zincate thus formed is a zinc compound and also an effectual resist against aniline-black. So, that, in August, 1892, the Manchester works was using a process of producing cloth having colored patterns on aniline-black grounds, printing the pattern upon the cloth in a resist containing oxide of zinc as its essential or active element and a coal-tar color, chrysamin, suitably drying the cloth and thereafter treating the cloth.

with a solution of prussiate aniline-black by slop-padding. This is the precise process of the patent unless the claim is to be restricted by the insertion of other elements not found in the specification or deducible from its language by any reasonable interpretation thereof. It is difficult to see wherein the patent, as issued, told the calico printers anything which they did not know before. The Manchester workmen with the specification before them in the summer of 1892 might well have adopted the precise process that was actually adopted by them. The patent as it is now construed, with half its contents disclaimed and the remainder reconstructed by subsequently acquired knowledge, is a very different document from that which came from the patent office. After the manufacture of the commercial calicoes the exact process of the patent, as contended for by the complainant, was carried out at the Manchester mills with a resist paste of zinc oxide, sodium acetate and a pigment color and also with a resist paste containing zinc oxide, sodium acetate, a basic coal-tar color, with tannic acid and acetic acid. Colored patterns on prussiate aniline-black grounds were thus produced, the resist being printed upon white cotton cloth. These calicoes were not produced commercially until February, 1893, about a month after the date of Whitehead's application, and there is some doubt as to the date when the process was successfully practiced prior to the spring of 1893. Bearing in mind the rule that prior use must be established beyond a reasonable doubt it may be true that the proof is insufficient, but there can be no doubt that prior to June 13, 1893, when the patent was made public, the Manchester mills had manufactured calicoes by a process which to-day would be a clear infringement of the claim, even if construed in all particulars as the complainant contends that it should be. This fact is important as showing how easy and natural it was for an expert calico printer, with the literature of the art before him, to make the improvement in question.

The suggestion that Stafford, the Manchester colorist, knew of Whitehead's process prior to the date of the patent has nothing but suspicion upon which to rest.

### Defects of the Patent.

There is no way of judging of Whitehead's intention except as it is gathered from the patent, which, as previously stated, is for an improvement in aniline-black resists. He was the manager of a Canadian print works, but was neither a chemist nor a color mixer. It is evident, however, from the language of his patent that he believed himself to be the first to discover that a zinc compound would operate as a reserve against aniline-black, no matter how produced. He made no distinction between white and colored patterns, evidently believing that the invention was equally present whether coloring matter was or was not mixed with the resist. In another patent of even date, granted to Whitehead, he says of the patent in suit that he has there "described and claimed specifically the use of a zinc compound to supply the zinc which is the essential or active element of the resist." The zinc compound was, in his opinion, the gist of the invention and the process operated equally well with

white patterns or colored patterns produced by mixing with the resist pigments, coal-tar colors or dyewood extracts. No distinction is drawn, no preference is given, no change is pointed out when the process is used to produce colored patterns, except the obvious one of mixing the desired color with the resist. The complainant, compelled to do so by the prior art, has disclaimed the process when used to produce white patterns and when used to produce colored patterns with pigment colors.

After all this the argument is advanced that Whitehead made a distinguishable invention as applied to coal-tar colors and dyewood extracts, because when these are used in conjunction with prussiate aniline-black and zinc oxide a certain phenomenon is produced which is not even hinted at in the specification. It would seem to be an attempt to construe the patent, not according to its plain language or the intent of the patentee, but to meet the exigencies springing from after acquired knowledge.

The question arises whether a patentee who has claimed a process for the production of white and colored patterns on aniline-black grounds can disclaim the process as to white patterns and pigment colored patterns and retain it as to coal-tar colors and dyewood extracts unless there is some statement in the specification which differentiates, in a patentable sense, these two classes of colors from the others named? The proposition is clearly stated by one of the defendant's experts as follows:

"The truth is, there is only one process in claim 2, which is the use of any zinc compound with any color and with any aniline-black solution. This is the process of claim 2 as originally allowed. It is practiced when a pigment color is used, when a coal-tar color is used, when a dyewood extract is used; and it is practiced no differently when one of these classes of colors is used than when either of the other classes is used. It is one and the same process when practiced with any color; and the patentee has disclaimed it."

Upon the face of the claim this argument is difficult to answer. The patentee says, in effect, to the public, I have invented a process which is applicable alike to white and colored patterns, the public is free to use the process as to all classes of colors but two, and as to these I reserve the right to use it as my exclusive privilege. The extent to which the court is required to go to sustain the patent may be illustrated by placing in juxtaposition the claim as issued and the claim as the complainant seeks to have it construed.

| The Claim as It Is. | The Claim as Complainant Construes It. |
|---|---|
| "(2) In the herein described process of producing cloth having colored patterns on aniline-black grounds, printing the pattern upon the cloth in a resist containing a zinc compound as its essential or active element, and a color, suitably drying the cloth and thereafter treating the cloth with a solution of aniline-black by blotching, slop-padding or dyeing, substantially as described. | "(2) In the herein described process of producing cloth having colored patterns on *prussiate* aniline-black grounds, printing the pattern upon the cloth in a resist containing *an oxide* of zinc compound as its essential or active element, and a *coal-tar or dyewood extract* color, suitably drying the cloth and thereafter treating the cloth with a solution of *prussiate* aniline-black by blotching, slop-padding or dyeing, *and fixing the color by zinc ferrocyanide produced by the reaction of the prussiate aniline-black with the oxide of zinc*, substantially as described. |

The court does not intend to intimate that to be valid the claim must contain a reference directly or by implication to zinc ferrocyanide, but there can be no doubt that the complainant relies upon the mordant thus formed as one of the essential features of the process and it would seem clear that a claim cannot be upheld which not only omits all mention of the mordant, but also of the ingredients which operate to produce the mordant. There can be no doubt that when prussiate aniline-black, zinc oxide and a basic coal-tar color are used that a mordant is formed, but how was a calico printer to learn this from the patent?

The complainant attributes to these printers a prescience so unusual that it defeats its purpose, for it can hardly be maintained that invention lies in telling the art what it already knows. The complainant's contention leads almost to the untenable hypothesis that color printers in 1893 would have known at once what to do even if the claim had on its face stated that any zinc compound, any aniline-black and any color might be used. Indeed, it is not easy to perceive why the argument would not apply if the patent had claimed simply the process of producing colored patterns on black grounds by means of a resist containing zinc. The statement that the ground was to be black would at once suggest prussiate aniline-black, the mention of zinc would suggest zink oxide and it would follow as a matter of course that a basic coal-tar color was intended because a fixing agent would thus be produced. The complainant relies upon the knowledge of the art to supply all the essential information of which he seeks to predicate the invention. But this will not do; it was incumbent upon Whitehead to tell the calico printers plainly what his invention was and how to practice it. This he has not done. On the contrary he has left the essential elements of the process to be selected by experiment and guesswork.

### The Law.

The rule deducible from the following authorities is that the specification must clearly describe and distinctly claim the invention. The public is entitled to know what the patent is for and it is an invasion of the rights of the public to change the claim by construction so that it covers processes which previously were free to all. Whether this injustice be attempted by broadening or limiting the claim is immaterial. Where a claim is clearly void the court cannot make it valid either by importing into it elements not mentioned therein or by construing the language of the claim to cover elements not clearly described in the specification. After claiming a process so broadly that it is met by the prior art and after the process practiced by following a certain formula has gone into general use, the patentee cannot so limit his claim as to cover that formula unless it be clearly described in the specification and the claim be susceptible of an interpretation including it.

In White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303, the court says:

"The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust

to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."

In McCarty v. Railroad Co., 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358, the court, at page 116, 160 U. S., page 242, 16 Sup. Ct., and page 361, 40 L. Ed., says:

"We know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim and avoid a defense of anticipation, we should never know where to stop. * * * This doctrine is too obviously untenable to require argument."

In Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344, the court says, at page 278, 95 U. S., and page 346, 24 L. Ed.:

"When the terms of a claim in a patent are clear and distinct (as they always should be), the patentee, in a suit brought upon the patent, is bound by it. Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235. He can claim nothing beyond it."

In Cambria Iron Co. v. Carnegie Steel Co., 37 C. C. A. 593, 96 Fed. 850, the circuit court of appeals of the Third circuit, speaking of the claim under consideration, says:

"The process therein claimed applies to 'the art of mixing molten metal.' By the use of the more general term 'molten metal,' it seems to us that the inventor intended to and did broaden his claim so as to include in it the treatment of all molten metals, whether drawn from the furnace or cupola. The natural meaning of the words 'molten metal' would require that construction, and it appears from the record that it is in accordance not only with the definition of the works furnished by scientific lexicographers and those skilled in the art, but with the understanding of the inventor himself."

In Carr v. Rice, 1 Fish. Pat. Cas. 198, Fed. Cas. No. 2,440, the court, at page 204, observes:

"To make their title good, the patentees must describe, fully and clearly, their whole invention, and the method of using it. If anything material, in respect to its construction or working, is omitted in their specification, they lose all claim to the exclusive use of their discovery."

In Matheson v. Campbell, 24 C. C. A. 384, 78 Fed. 910, 921, the court, at page 396, 24 C. C. A., and page 923, 78 Fed., says:

"The evidence shows conclusively that the statement that they had discovered that 'any sulpho acid of any radical' treated according to their process would give the product they said it would was untrue. Briefly stated, the 'discovery' which the inventors profess to disclose is that all mono-sulpho acids, and all di-sulpho acids treated in a prescribed way, will give a specific result, while the fact is that, so far as appears, no mono-sulpho acid thus treated will give such result, and when they professed thus to disclose their 'discovery' they either knew that the mono-sulpho acids will not give such result, or else knew nothing about the reaction of mono-sulpho acids under such process. In either case the 'discovery' which they disclosed is not the 'discovery' which they made, and it is for the discovery or invention which the patentee makes and discloses that patent issues."

In McBride v. Kingman, 38 C. C. A. 123, 97 Fed. 217, it was said:

"It would constitute rank injustice to permit an inventor, after a combination or device that he did not distinctly claim in his patent had gone into general use, and years after his patent had been granted, to read that combination or device into one of the claims of his patent, and to recover for its infringement of every one who had used it upon the faith of his solemn declaration that he did not claim it."

## Argumentum ad Hominem.

If the patent be couched in language perspicuous and distinct, why is it necessary to present 2,000 pages of record and 350 pages of argument directed almost exclusively to the task of finding out what the patent means? The most learned chemists in the land differ radically and almost acrimoniously upon every vital point and not infrequently those enlisted upon the same side are not in perfect accord. Were the patent taken bodily from Holy Writ no more antagonistic dogmas and warring theories could be deduced therefrom. Where so many accomplished specialists disagree, where so many propositions have been advanced tentatively and withdrawn, where reasons for certain phenomena are conceded to be wholly unknown, the ordinary layman may, perhaps, be pardoned for suggesting that a document which has brought about such a condition of affairs is not written in the clear language which the patent law requires. And yet the patent, if interpreted according to the ordinary meaning of its language, is plain enough. If the claim in question be construed to cover the process broadly covered by the first claim, when such process is applied to colored patterns, the patent seems harmonious in all its parts. It is only when the attempt is made to construe the claim according to the alleged nomenclature of the art that controversy begins. Unless the complainant can furnish a reliable chart and a more accurate compass he can hardly expect the court to steer a straight course through a "sunless sea" of zinc, coal-tar and aniline-black.

## Conclusions.

It is thought that the following propositions have been established:

First. Whitehead was not the first to use a process in which a zinc compound was employed as a resist against aniline-black.

Second. He was not the first to use oxide of zinc as a resist against prussiate aniline-black.

Third. He was not the first to use a resist against prussiate aniline-black containing oxide of zinc and a coal-tar color.

Fourth. There are a number of zinc compounds which will not successfully resist prussiate aniline-black.

Fifth. Zinc ferrocyanide is not in itself a resist against aniline-black.

Sixth. The claim cannot be limited to prussiate aniline-black.

Seventh. It cannot be limited to oxide, carbonate and hydrate of zinc.

Eighth. It cannot be limited to basic coal-tar colors and dyewood extracts.

Ninth. It cannot be limited to a process producing zinc ferrocyanide as a mordant.

Tenth. Unless limited, as is urged by complainant, it is anticipated by the Manchester prior use in the summer of 1892.

It follows that the bill must be dismissed.