CAMBRIA IRON CO. v. CARNEGIE STEEL CO.

CARNEGIE STEEL CO. v. CAMBRIA IRON CO.

(Circuit Court of Appeals, Third Circuit. June 24, 1915.)

No. 1857.

1. PATENTS ☞318—SUIT FOR INFRINGEMENT—ACCOUNTING FOR PROFITS.

On an accounting for profits for infringement of a process patent, the infringer is not liable for the profit made by his use of what is already free to the world, but only for the profit made by the use of the patentee's contribution to the art; and if he could have obtained the same result by the use of older methods, such methods are the proper standard of comparison, and the measure of the profit for which he is liable is the lessened cost of production, if any, by the use of the patented process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. ☞318.

Accounting by infringer of patent for profits, see notes to Brickill v. Mayor, etc., of City of New York, 50 C. C. A. 8; Clark v. Johnson, 120 C. C. A. 389.]

2. PATENTS ☞318—SUITS FOR INFRINGEMENT—ALLOWANCE OF INTEREST.

The allowance of interest on an accounting for infringement is largely a matter of discretion, to be exercised under the circumstances of the particular case.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. ☞318.]

Cross-Appeals from the District Court of the United States for the Western District of Pennsylvania; Joseph Buffington, Judge.

Suit in equity by the Carnegie Steel Company against the Cambria Iron Company. Decree for complainant, awarding damages, and both parties appeal. Affirmed.

See, also, 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968.

---

Charles C. Linthicum, of Chicago, Ill., and David A. Reed, of Pittsburgh, Pa., for plaintiff.

James I. Kay, of Pittsburgh, Pa., and Francis T. Chambers, of Philadelphia, Pa., for defendant.

Before McPHERSON and WOOLLEY, Circuit Judges, and THOMSON, District Judge.

### Cambria Iron Company's Appeal.

McPHERSON, Circuit Judge. This prolonged litigation is now, we may hope, approaching its final stage. It grows out of the Jones patent, No. 404,414, granted June 4, 1889, for an improvement in the method of mixing molten pig metal, and charges the Cambria Iron Company with infringement, especially of the second claim. In a very careful and elaborate opinion (Carnegie Steel Co. v. Cambria Iron Co. [C. C.] 89 Fed. 721) Judge Buffington sustained the validity of this claim and held the process infringed. He found that the central idea of the patent was the maintenance of a "dominant pool"—a happy term, as the Supreme Court afterwards said—and that the Iron Company's method was a plain infringement. The Circuit Court of Appeals disagreed on the subject of infringement (Cambria Iron Co. v. Carnegie Steel Co., 96 Fed. 850, 37 C. C. A. 593), but the majority of the Supreme Court differed from this opinion, and adopted the views of the District Court (Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968). Thereupon the case went to an accounting, and in that proceeding the Carnegie Company did not ask for damages, but demanded profits alone. As the principal question, both below and here, is, By what standard should the profits be computed? we may pause to consider the established rule on this subject.

[1] Of course, such an inquiry always seeks to ascertain how much money the infringer has made by the use of the patented process; but the problem is not fully stated in so general a form, since this may leave out of account the infringer's right to use whatever is open to the world. The state of any art usually presents much that may be freely used, and if these devices can do substantially the same work, if they can produce the same result that is accomplished by the process in question, a patentee cannot complain if the earlier methods be adopted. What he has done is to contribute something to an existing stage of development, and therefore an infringer is liable, not for the profit made by his use of what is already free to the world, but only for the profit made by the use of the patentee's contribution. But it must always be borne in mind that in order to compare processes accurately they must be such as produce the same, or practically the same, result. Speaking generally, the object of any process is to produce something to be sold or used. Nobody practices a process for the mere satisfaction of taking the steps required; at the end, he desires a foreseen result, and if the thing produced be inferior in quality or less adapted for use than the thing produced by the patented process, the comparison is not satisfactory. Under such circumstances the cheaper cost of the inferior article is not decisive. Certainly it would not be fair to say that, because an infringer might

have produced an inferior unpatented article more cheaply, his possible profit in so doing should measure the amount of his liability, although he had really gained a larger sum by producing the superior article protected by the patent. A court is more concerned with actual facts than with contingencies.

These rules are scarcely open to question. In Mowry v. Whitney, 81 U. S. (14 Wall.) 621, 20 L. Ed. 860, the Supreme Court said:

"The question to be determined in this case is: What advantage did the defendant derive from using the complainant's invention over what he had in using other processes then open to the public and adequate to enable him to obtain an equally beneficial result? The fruits of that advantage are his profits. They are all the benefits he derived from the existence of the Whitney invention. It is found that there were other processes by which the inherent strain caused by unequal cooling could be, and was prevented, counteracting which strain was the sole object of the complainant's invention, and a car wheel could be prepared for similar service, valuable in the market, and salable at a price not less than was obtained for those which the defendant manufactured. The inquiry then is: What was the advantage in cost, in skill required, in convenience of operation, or marketability, in bringing car wheels by Whitney's process, from the condition in which they are when taken hot from the molds to a perfected state, over bringing them to the same state by those other processes, and thus rendering them equally fit for the same service? That advantage is the measure of profits."

And in Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664, the Supreme Court used the following language in speaking of the profits for which an infringer must account:

"The infringer is liable for actual, not for possible, gains. The profits, therefore, which he must account for, are not those which he might reasonably have made, but those which he did make by the use of the plaintiff's invention, or, in other words, the fruits of the advantage which he derived from the use of that invention over what he would have had in using other means then open to the public and adequate to enable him to obtain an equally beneficial result. If there was no such advantage in his use of the plaintiff's invention, there can be no decree for profits."

See, also, Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609.

The object of the Jones patent is the mixing of molten metal from a blast furnace in such a manner that, as successive charges of the mixture are furnished to a Bessemer converter to be transformed into steel, they shall change their composition and other characteristics so gradually that for practical purposes each charge shall be substantially uniform with its immediate predecessor. And the object is accomplished; the result is that a better and a more uniform steel is produced. The molten metal does not cool after leaving the blast furnace, and this method of producing steel is therefore properly called "direct." Other direct methods had previously been used, but these had not been successful. We need not pass upon the Steel Company's contention that the Supreme Court has by necessary inference excluded the direct process in any of its varieties from use as a standard of comparison. For present purposes we may assume that this process was still open to consideration after the case was sent back for the purpose of taking the account; but we do not think the conclusion can be avoided that the court did express a definite opinion

about the merits, and therefore the availability, of this process. A few quotations will show clearly that the earlier methods were considered, and were declared to produce an inferior result:

Page 424 of 185 U. S., page 706 of 22 Sup. Ct. [46 L. Ed. 968]: "While all [these prior devices] contemplate the reservoir between the blast furnaces and the converters, such reservoir is used for storage and for such incidental steps toward uniformity as the necessary mixing of the different products of the blast furnace would lead to, while in none of them is there a provision for supplying and withdrawing from the mixer such quantities of metal at a time, and the retention of a considerable quantity of metal in the reservoir, as a necessary prerequisite to that uniformity of product which was recognized as the great desideratum and was the constant effort of manufacturers to secure. Granting that some of these devices may have been made use of to carry out the Jones process, none of them in practical operation, seems to have been effective to secure the desired result. * * *"

Page 425 of 185 U. S., page 707 of 22 Sup. Ct. [46 L. Ed. 968]: "To enable the Jones process to be successfully carried out it is necessary: (1) That the intermediate reservoir or mixer should be of large size, 'say 100 tons' capacity; (2) that it be covered to prevent the access of cold air from without; (3) that it be provided with a stop, so that it may not be tilted so far as to be emptied of its contents; (4) that a quantity of molten metal, so large as to absorb all the variations of the product of the blast furnace received into it and thus to unify the metals discharged into the converters, be constantly retained in it. None of the prior patents or processes to which we are referred meets these requirements. Indeed, it is scarcely too much to say that none meets more than one of them. When we add to this that none of them was ever used, or was ever susceptible of being used, without material alteration, to carry out the Jones process, it is evident that the defense of anticipation by prior patents rests upon a slender foundation.

"Certain discussions, reported in the Journal of the British Iron and Steel Institute, are relied upon as embodying a description of the Jones process. Running through all these discussions there is the same idea of the difficulties experienced in the practical carrying out of the direct process by reason of the want of uniformity in the different products of the blast furnaces, and the possibility of remedying this and thereby doing away with the expense of remelting the pig iron in cupolas by a mixture of such products in a reservoir intermediate the furnaces and converters; but the dominant idea of the Jones patent, of maintaining a permanent and large quantity of molten metal in the mixer for that purpose, does not seem to have occurred to any of the writers upon the subject. Through all these papers there is an admission of practical failure in the efforts theretofore made to obviate the difficulty, and a half-expressed hope that American ingenuity might ultimately solve the problem. * * *"

Page 429 of 185 U. S., page 708 of 22 Sup. Ct. [46 L. Ed. 968]: "An attempt was made to show that the Jones invention was anticipated by the practice, common in steel works prior thereto, of tapping iron from cupola furnaces into a receiving ladle, which became known as the Bessemer cupola ladle, from which it was poured into the converters. Molten iron was tapped from several cupolas into this ladle, from which a charge was drawn and delivered to the converter vessel. Of course, if the ladle were of greater capacity than was necessary to charge a single converter, a residuum of metal would be left in it; but this seems to have been merely an incident of the operation of the ladle, which was used primarily for storage, and to have been of no substantial benefit in securing uniformity of product, which can only be obtained by making the receiver of larger size and retaining a considerable quantity of metal in it after each discharge. * * *"

Page 445 of 185 U. S., page 715 of 22 Sup. Ct. [46 L. Ed. 968]: "Discarding, now, all that does not bear directly upon the validity of the Jones patent, and dropping all superfluity of words, let us determine exactly what Jones has contributed, if anything, to the art of making steel. He undoubtedly found reservoirs of small size in use, in which were poured from receiving ladles enough molten metal to fill them, and from which a sufficient amount

was discharged to supply a converter, usually about half the size of the reservoir. But in all these cases the fact whether any particular amount of metal was left in the reservoir was treated as a matter of indifference or accident, although there must have been necessarily some incidental mixing; and probably the metal as it ran into the converters approximated more nearly to uniformity than when it ran into the reservoir. The former methods were adequate for cupola metal, uniformity in which had been largely secured by a careful selection and breaking up of the pigs; but it had not proved a success for blast furnace metal, except that it had been used to a very limited extent in foreign countries, where the peculiar character of the iron ore had rendered it possible to carry on a direct process, although apparently by methods quite other than those employed by Jones. The principal step employed by Jones was to magnify the capacity of the reservoir about twenty-fold, provide it with a cover, and to arrange that it should not be tilted beyond a certain point, in order that a 'considerable quantity' of molten metal might be retained in it for a sufficient time to accomplish a pretty thorough mixing, but little change having been made in the meantime in the size of the receiving ladles and converters. As the reservoir was designed to hold a large quantity of metal for a considerable time, it must have been covered to obviate the contents being crusted over or skulled.

"As soon as this method had proven to be successful by employment at the Edgar Thomson Works, and had become so well known as to attract the attention of other manufacturers of steel, it found a ready sale, was adopted by all the leading manufacturers in this country, and was sold for use abroad for about $50,000.

"It should be borne in mind that this process was not accidentally discovered, but was the result of a long search for the very purpose. The surprise is that the manufacturers of steel, having felt the want for so many years, should never have discovered from the multiplicity of patents and processes introduced into this suit, and well known to the manufacturers of steel, that it was but a step from what they already knew to that which they had spent years in endeavoring to find out. It only remains now for the wisdom which comes after the fact to teach us that Jones discovered nothing invented nothing, accomplished nothing."

There was another method, however—the "indirect," or cupola, method—by which better results were produced than by any direct process. In the cupola method the molten metal from the blast furnace was run into pigs and allowed to cool, and these were afterwards carefully tested, selected, mixed, and remelted in the cupola, thus producing in the successive charges furnished to the converters a practical and substantial uniformity similar to that produced by the patented process. But the cupola method is more expensive, and the patented process has thus a decided advantage.

What standard of comparison, then, should be used to determine the profit made by the Cambria Iron Company during the infringing period? Certainly not the direct process in any of the forms used before Jones came into the field, for this process would not produce the same result. As the Supreme Court has said (page 411 of 185 U. S., page 702 of 22 Sup. Ct. [46 L. Ed. 968]):

"Practical experience, in this country at least, showed that the refining of iron without first casting it into pigs, selecting or mixing the pigs, and remelting them, was attended with such expense that the entire abandonment of the practice was seriously considered."

The direct process is also declared (page 415 of 185 U. S., 22 Sup. Ct. 698 [46 L. Ed. 968]) to have had difficulties "so serious as to render [it] commercially impracticable"; and the court also said (page

417 of 185 U. S., 22 Sup. Ct. 698 [46 L. Ed. 968]) that "such attempts [to use it] in this country had proven practically failures and had been abandoned." On the other hand, the cupola process is thus referred to (page 410 of 185 U. S., page 701 of 22 Sup. Ct. [46 L. Ed. 968]):

"The process of running molten metal from blast furnaces into pigs and remelting them in cupola furnaces for use in a converter was termed the indirect process, and was generally used prior to the Jones invention. * * * "

Page 413 of 185 U. S., page 702 of 22 Sup. Ct. [46 L. Ed. 968]: "By this cupola process a product, practically uniform in character and suitable for further treatment in the converters, was secured, but at the expense (more than 60 cents per ton) of rehandling and remelting the iron as it came from the blast furnaces, in cupolas, and the contamination of the metal with sulphur evolved from the coke in the process of remelting."

And the testimony of Mr. Julian Kennedy, one of the experts, is quoted with approval on the same page:

"For this reason the practice, until within comparatively recent years, has been to cast the metal in pigs, then to analyze it and reject any portion not closely approximating a rigid specification in its chemical composition, and to select, mix, and then melt the approved metal in cupola furnaces. By this means very great uniformity of chemical composition of the remelted metal can be obtained, and good and reliable steel made from it with regularity and certainty."

It would seem quite clear, therefore, that the proper standard of comparison is the cupola process, and this is the standard adopted by Judge Buffington in the court below. This also was the process used by the Cambria Iron Company itself before it adopted the infringing device, as will clearly appear from these further extracts from the Supreme Court's opinion (page 438 of 185 U. S., page 712 of 22 Sup. Ct. [46 L. Ed. 968]):

"The question of infringement only remains to be considered, and, in the view we have taken of the prior devices, presents no serious difficulty. The Court of Appeals was of opinion that 'the defendant's reservoir, or accumulating ladle, complained of, is the same in principle as one which has been in use at the Cambria Works ever since Bessemer steel was first manufactured there, with only this difference, that at first it was used at cupola, now at furnace.' If such were the fact, of course, defendant would not be open to the charge of infringement. Undoubtedly it has the right to make use of all prior devices, and particularly such as had been used at its own manufactory. In order to understand the device made use of by the defendant prior to the Jones invention, we reproduce herewith two small, but easily understood, cuts taken from its brief, showing the character of the ladle known as the Bessemer intermediate ladle, used by it and generally by all American mills manufacturing steel by the Bessemer process. [Reproducing cuts.]

"It appears elsewhere in the testimony that the intermediate reservoir or ladle was from 15 to 18 tons capacity, and the converter from 6 to 8 tons; that the molten metal was tapped from the cupolas into the reservoir and withdrawn for the converter, and as the intermediate ladle held considerably more than the amount of metal necessary to charge a converter, there was some incidental mixing; but the main and perhaps the only purpose of the reservoir was for storage, and that if any quantity of metal were left in the reservoir it was by accident rather than by design. It will be noticed, too, that the reservoir was open at the top. It does not appear to have been made use of in carrying out what is known as the direct process, the difference being that the cupola practice furnished a metal for the Bessemer converter that was uniform in composition, or practically so, while the direct metal was largely variable in composition.

"The testimony further shows that, after the installation of the Jones mixer at the Edgar Thomson Works, Mr. Morgan, the defendant's mechanical engineer, visited and inspected these works and obtained information as to their practical operation, and was advised by the superintendent as to the location and proper size of the mixer and its contiguity to the converters. Mr. Morgan does not deny this conversation, although he qualifies it by saying that he thought the Jones apparatus had grave defects. Shortly after this visit, and in the latter part of 1895, defendant installed an apparatus of its own for the operation of the direct process, which is herewith produced upon a small scale, and in comparison with the Jones process. [Reproducing cuts.] It consisted of a covered refractory lined and turtle-shaped vessel of about 300 tons capacity, and arranged to tilt, and having a spout at either side for receiving and pouring out the metal. The metal was brought to the mixer and poured in at one end, and through a spout on the other side was poured into a ladle, which supplied the Bessemer converters. The metal was supplied both from blast furnaces and cupolas, the former furnishing about two-thirds, the latter about one-third, of the metal used; but the metal from the cupola system was delivered by a ladle to the converter direct, and not through the reservoir. The metal from the blast furnace entered the reservoir in about 15-ton ladle lots, and was withdrawn in approximately 12-ton lots. The chief engineer of the company states that, 'in accordance with the natural way of using the reservoir, it is ordinarily kept well filled up.' That in the practical operation of the mixer or reservoir a large quantity of iron was retained for mixing purposes is evident from the fact that a chalk mark was made on the side of the mixer, which was not allowed to run below the floor, as a guide to the men who rotated or tilted the mixer, since, if the mark went below the floor and out of sight, they could not tell how much iron was left in the mixer. Under these instructions not to allow the chalk mark to go below the floor, there was retained in the mixer about 175 tons of molten metal, amply sufficient for the purposes stated in the Jones patent. Its principle of construction was similar to that of the Jones mixer, and its operation identical. Indeed, defendant's engineer himself says: 'With the exception of additions of cupola metal, I do not know that there is any material difference between our practice and that described in the second claim' of the Jones patent. We agree, in the opinion of the Circuit Court, that 'it is quite clear, in view of these facts, that infringement takes place. That initial mixing, rather than storage, is the purpose of the reservoir is shown by the fact that the cupola metal is not stored, but served direct in ladles to the converter plant. And that the homogeneous mixture, once obtained, is used as a dominant pool to produce a graduated, nonabrupt product, is shown by the chalk line minimum limit of 175 tons. With such a permanent dominant pool in constant use, we are clear that respondent's practice infringed the second claim of the Jones patent in both letter and spirit.'

"If the contents of the mixer used by defendant were allowed habitually to become empty in carrying out its process, there would be no infringement; but all the evidence contradicts this. In the Jones practice this cannot be done, since the mixer cannot be tilted beyond a certain point. In the defendant's mixer it can be done, but is not, since the operator is not allowed to tilt it beyond a certain point gauged by a chalk mark. This seems to be the only foundation for the charge so frequently reiterated, and in varying language, that the methods in use before the Jones process deprived that process of all novelty, and if novelty existed it was by reason of the varying modes of executing such methods; the inference from this being that, as the Jones method was old, it could only be treated as new because of the conduct of individuals in applying the method and their intentions, and that this reduces itself to the proposition that the Jones patent rests upon the mere intention or minds of persons. If we understand this argument correctly, it is that the prior method contemplated storing only, and the mixing was but an incident, while the Jones patent contemplates mixing as its main object and storage only as an incident. * * *

"If, as insisted by the defendant and found by the Court of Appeals, the reservoir now used is the same in principle as the one which had been in use at the Cambria Iron Works ever since the Bessemer steel was first manufac-

tured there, and the same were adequate for the purposes of the direct pro-
cess, why was any change made? Therein we think the Court of Appeals
made its most serious error. The defendant had an unquestioned right to
manufacture steel, as it had been accustomed to do; but instead of that it
abandons the Bessemer uncovered ladle of 12 to 18 tons, and adopts a covered
refractory lined reservoir of 300 tons capacity, and makes use of it, not as
before, for the storage of cupola metal, but for the mixing of blast furnace
metal according to the direct process. This, too, was done immediately after
Mr. Morgan's visit to plaintiff's works."

Judge Buffington's opinion, adopting the cupola method as the proper
standard of comparison, has not been reported, and we quote a part of
his discussion:

"First. As found by this court, the chalk mark direct-method practice of
the defendant infringed the second claim of the Jones' patent. As conceded by
the parties the defendant from November 1, 1895, to October 31, 1898, manu-
factured 526,445½ tons of steel by said infringing direct-method process. In
accord with the findings of the Supreme Court, and this court, and the proofs,
we now find and hold that there was no other direct process in use prior to
Jones' which produced the result of Jones' process. We accordingly find the
proper standard of comparison for measuring the profits accruing to the de-
fendant by the use of the Jones process was the cupola practice, the only suc-
cessful practice then known and open to the public. In line with this conclu-
sion we refer to the following authorities: Tilghman v. Proctor, 125 U. S.
136, 8 Sup. Ct. 894, 31 L. Ed. 664; McCreary v. Penna. Canal Co., 141 U. S.
459, 12 Sup. Ct. 40, 30 L. Ed. 817; Sessions v. Romadka, 145 U. S. 29, 12 Sup.
Ct. 799, 36 L. Ed. 609; 3 Robinson on Patents, § 1145; Locomotive Safety
Truck Co. v. P. R. R. (C. C.) 2 Fed. 677.

"Comparing the relative costs of the cupola and the direct methods, we note
that, as blast furnace smelting is a step common to both, the cost of blast
furnace treatment need not be considered. The evidence shows that, where
the Jones direct method was used, the cost of transportation service from blast
furnace to mixer was $0.0615, and of mixer supplies and treatment $0.1131
per ton, a total of $0.1746. The proofs also show that in the cupola practice
there was a metal loss, in excess of the direct process, of from 3 to 4 per
cent. This loss was occasioned by metal being carried off with slag in the
cupola melting process. This loss is well established by the proofs—Williams,
McDonald, and Lewis—under which there is full warrant for fixing the money
value thereof at $0.3331, the amount claimed by plaintiff. In addition to this,
in the cupola practice the molten metal from the blast furnace was cast into
pigs, these pigs being subsequently classified and put into the cupola for re-
melting. The cost of these operations was saved in the direct process, where no
casting and no remelting took place. During the infringing period the defend-
ant used in its mixer both direct metal from its blast furnaces and remelted
metal from its cupolas. The expenses incurred by it in its own cupola practice
would seemingly afford reliable data from which a cost standard of compari-
son could be established. These costs, as shown by the defendant's cupola
operations, were, for the expense of casting, transportation, etc., $0.263 per
ton, and for cupola operation, fuel, labor, and incidentals, $0.669 per ton, a
total of $0.932. As to this last item, $0.669, no question is made, but as to the
item of $0.263 it is contended the same is too high. We have carefully con-
sidered the testimony of Mr. McHenry, the auditor of defendant, who fur-
nished these figures. As we understand his contention, it is that, while these
figures show the actual costs of the defendant in the casting incident to its
cupola practice during the infringing period, they should not be followed, for
the reason that this cost would have been much lower if the defendant had not
used the infringing process, but had cast all its metal into pigs and used the
cupola method alone. This contention does not commend itself to us. The
simple fact is that the defendant did infringe, and in the cupola practice in-
cident to such infringement did incur these costs. We have, therefore, before
us these admitted costs based on the actual workings of the defendant when
carrying on their infringing operations. This affords a practical and reliable

standard of comparison. The other is problematical. With the presumptions that properly arise against an infringer (Westinghouse v. Wagner, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. [N. S.] 653), and with these data based on actual practice before us, we feel warranted in adopting such proven figures in preference to speculative estimates. Finding, then, as we do, that the defendant by the use of the Jones process in its chalk marked mixer realized a profit and saving over the cupola method of $0.3331 in metal saving and $0.7574 in smelting per ton, a net saving of $1.0925 on 526,445½ tons, we find the defendant should account to the plaintiff for the sum of $575,141.71."

We shall only add that we are in full agreement with this conclusion, and see no need to discuss the correctness of the figures. Upon the appeal of the Cambria Iron Company, therefore, the decree will be affirmed.

### Carnegie Steel Company's Appeal.

This appeal raises two questions: First, whether the Iron Company is liable after November 1, 1898, when its practice was changed; and, second, from what date interest should be allowed.

Upon the first question we do not find it necessary to say more than this: Without committing ourselves to the proposition that the so-called "random" process is always noninfringing, we understand that the following quotation from the opinion below means that on the record before the court this particular use of the "random" process did not infringe:

"From November 1, 1898, to May 31, 1902, there was manufactured by the same appliances, but by a different practice, to wit, the random practice, 1,600,094 tons of steel. We find that such random practice, as well as the subsequent fill and empty practice, did not infringe the Jones patent for the reason that its operation without any mark or stop, and without the maintenance of any dominant pool, did not fulfill the requirements laid down by the Supreme Court in reference to a reservoir, namely: '(3) That it be provided with a stop, so that it may not be tilted so far as to be emptied of its contents; (4) that a quantity of molten metal so large as to absorb all the variations of the product of the blast furnace received into it, and thus to unify the metal discharged into the converters, be constantly retained in it.' So far as fact proof is concerned, we find support for this conclusion in the testimony of the witnesses Halderman, Stewart, Lewis, Frederick, McGarvey, Callio, Horner, Parker, and others."

[2] Upon the second question we are also in accord with the District Court. The allowance of interest is largely a matter of discretion, to be exercised under the circumstances of the particular case, and we have not been persuaded that error was committed by fixing May 1, 1912, the date of the master's report.

Upon each appeal the decree is affirmed; the Cambria Iron Company to pay the costs in this court, and the costs in the District Court to be awarded by that tribunal.