## AMUSEMENT CORPORATION OF AMERICA v. MATTSON.

## MATTSON v. AMUSEMENT CORPORATION OF AMERICA.

### No. 10691.

Circuit Court of Appeals, Fifth Circuit.

Nov. 10, 1943.

694

Albert G. McCaleb, of Chicago, Ill., for appellant and cross-appellee, Amusement Corporation of America.

Burton G. Henson, of Tampa, Fla., for Bernard O. Mattson, appellee and cross-appellant.

Before HUTCHESON and HOLMES, Circuit Judges, and RUSSELL, District Judge.

HUTCHESON, Circuit Judge.

The suit was against two defendants, appellant and one Corbett, for infringing use of a "new and useful improvement in a moving target adapted for use in shooting galleries and similar places where target practice is carried on", and for the damages and profits resulting therefrom. Appellant, through some oversight not explained in the record, defaulted, and there was an interlocutory decree and injunction and a reference to a special master to ascertain gains and profits and damages. Appellant, learning of the reference, appeared by counsel in the proceedings before the master.

The master found that the damages and profits could only be estimated from a fair preponderance of the testimony, that the damages in their nature were not as susceptible of proof as the profits were, and that the profits were not susceptible of exact mathematical calculation or determination with reasonable certainty. He awarded nominal damages of $1 only. On the issue of profits (though, on his findings,[1] appellant and Corbett were not partners but mere co-infringers, and of the income from the shooting gallery where the infringed device was being used, appellant received only 40 percent of 60 percent), he

---

[1] "2. During the period involved herein the Defendants were engaged together in the traveling show or carnival business playing or operating in various cities throughout the United States and Canada, generally for weekly engagements at or near some city. The Royal American Shows is a trade name for one of the several carnival shows owned or operated by the defendant, Amusement Corporation of America. The general plan of operation consisted of an arrangement whereby the Amusement Corporation of America furnished or secured space or show grounds from various civic and fair associations and others. The Defendant corporation arranged for housing, feeding and transportation of their own equipment and employees together with the equipment and employees of the various units which made up generally the entire show business of the defendant Amusement Corporation of America on some basis not disclosed by this record.

"3. In the instant case the defendant, William Corbett, operated a shooting gallery as part and parcel of the Royal American Shows. The defendant, Corbett, furnished the equipment of his particular shooting gallery, paid for the ammunition and his help in connection with the operation of the shooting gallery out of 60% of the gross income from the shooting gallery involved herein and turned over daily to the defendant, Amusement Corporation of America 40% of the gross intake or gross profits received from the operation of which is termed as short-range and long-range target gallery.

"4. The short-range gallery consisted of some sort of device where patrons of the Royal American Shows shot 22 calibre rifles at a close-up target for prizes. The long-range targets consisted mainly of stationary and movable targets including the moving duck-pond targets involved in this case, at the same ground space but a greater distance from the place of firing than the short-range targets, so that at all times the frontage of the shooting gallery remained the same. The patrons of the Royal American Shows shot at these more distant targets for amusement only and as an exhibition and development of skill for the price or charge of 25 cents per gun load consisting of 12 or 15 twenty-two short cartridges and apparently no money or other prizes were given or awarded to the customers for skill in connection with shooting at any of the long-range targets. For that reason the profits from the long-range targets are easier calculated than the profits of the short-range targets. The moving duck-pond targets which this Court has held to be an infringement of the plaintiff's patented device sat on the ground and below and as a part of the other long-range targets in the unit of

found the defendants were in the position of joint tort-feasors and were, therefore, jointly liable to plaintiffs for all the profits attributable to the use of the infringed device in the aggregate sum of $12,390.54. Of the opinion that plaintiff was entitled under the statute, 35 U.S.C.A. § 70, to have the profits trebled, he so found and recommended. The district judge rejected the master's recommendation for trebling profits but accepted his findings and recommendations on actual damages and profits, and entered a decree accordingly.

Appellant is here insisting (1) that the profits were wrongfully found, and (2) that it may not be charged with more of the profits than it actually received. Appellee by his cross-appeal assigns error on the refusal to treble the profits. There is no dispute about what the infringed de-

Royal American Shows operated by the defendant, Corbett, and took up no additional space laterally or horizontally and very little space vertically.

"5. By a fair preponderance of the testimony the Master finds that the infringing duck-pond targets were operated by the defendants in their show business wherever and whenever the long-range targets were used except in Canada and a few other places in the United States where long-range targets were prohibited by law or ordinance. The plaintiff proved from the daily bookkeeping records of the defendant, Amusement Corporation of America, their exact 40% take from the operation of the shooting gallery operated by Corbett as one of the units of their show or carnival aggregated $9,292.15 for the days when the said shooting gallery used the long-range targets during said almost three year period. The plaintiff introduced testimony of persons skilled and acquainted with the operation of this particular shooting gallery and others which proved to the satisfaction of the Master that when the long and short-range targets were in operation approximately two-thirds of the persons or patrons who shot at these targets shot at the moving duck-pond targets because of their greater attractiveness to the public. By the plaintiff's own testimony it is admitted that the ammunition used in this class of shooting gallery was bought during the period for approximately $30.00 per case of 10,000 cartridges, making each gun load of ammunition consisting of twelve to fifteen shots cost no more than four and one-half cents for which the defendant charged the public twenty-five cents per gun load including the use of the small 22-calibre rifle.

"6. The Master therefore finds that from the gross profit taken in by the defendants only 20% should be deducted as expense for ammunition and for wear and tear and replacement of fire arms. The defendants evidently had some other expenses but failed or refused to itemize their other overhead expenses in connection with this shooting gallery unit of the Royal American Shows and it appears that neither of the defendants kept any such books which would show any overhead expense which could or should be allocated to the operation, management or transportation of the moving duck-pond target device which is the subject of this controversy, nor did they attempt to do so.

"7. Based upon a fair preponderance of the testimony in this cause the Master finds that the moving duck-pond targets involved herein caused neither of the defendants any appreciable additional expense over and above the fixed cost of the operation, management and transportation of the balance of the movable and immovable targets comprising the shooting gallery show of the Royal American Shows. Because of its mechanism and juxtaposition in relation to the other targets the moving duck-pond targets involved herein occupied little or no extra ground space than that required by the remaining targets. The gross profits or intake from the moving duck-pond targets were substantially clear profit to the defendants save and except 20% allowance for ammunition and rifle maintenance, all of which came out of Corbett's 60% share.

\* \* \* \*

"9. After hearing the testimony in this case, hearing oral argument of Counsel and reading their briefs and citations of authority, the Master finds and recommends that the defendants, William Corbett and the Amusement Corporation of America, are in the position of joint tort-feasors in the use of the infringing device involved and are jointly liable to the plaintiff patentee, Bernard G. Mattson for their infringement and their participation in the use of and profits of the infringement."

"10. From a fair preponderance of the testimony the Master also finds that the defendants jointly took and received a profit from the infringing device over the period mentioned in the interlocutory order of this Court in the aggregate sum of twelve thousand three hundred eighty-nine and fifty-four one-hundredths ($12,-389.54) dollars which they hold as trustees ex-maleficio for the use and benefit of the plaintiff and treble said damages amounts to thirty-seven thousand one hundred sixty-eight and sixty-two one hundredths ($37,168.62) dollars."

vice used was or that it was a mere improvement over other devices of the same general nature. It was for a moving target for use in target practice, the utility and advantage of which as claimed by plaintiff in his patent, consisted "in providing a mechanism whereby the moving targets travel about vertical axes so that the depth of the tank may be considerably reduced, and in practice this depth has been reduced to six inches. Such a change in structure makes the arrangement more practicable and adaptable for use in places where a deeper tank could not be used". All claims of the patent are definitely limited to the target conveyor traveling in a horizontal plane as distinguished from the target conveyor traveling in a vertical plane as in the admittedly old duck-moving-over-the-water-in-a-tank target discussed in the introduction to the patent specification. What plaintiff invented, and all that he got his patent for in 1937, was an improvement in a moving target having as a novel feature thereof a conveyor which operates in a horizontal instead of a vertical plane and all of the claims of his patent contain limitations to that specifically new duck-moving mechanism. Plaintiff does not claim to have invented moving targets for target practice; they were and have long been well known. In the second sentence of his patent, he very correctly says: "The use of moving targets for target practice is well known, and moving targets customarily are moved on an endless conveyor chain or belt which travels about horizontal axes". The patent drawings show a tank of water and depict target moving mechanisms so arranged that the ducks appear to be swimming over the water and are capable of being knocked over into it when struck by bullets. Mattson did not invent these things. Indeed, in describing his invention, he says: "An innovation recently introduced is the use of a tank of water with the moving mechanism so arranged that the targets, which are generally formed to simulate ducks or other water fowls, appear to be swimming over the water and when the target is struck, the plate simulating the fowl will be knocked over into the water."

Thus the only elements and features of the patented apparatus that shooting gallery marksmen would be interested in, the tank of water and ducks appearing to swim over it and dropping into it when struck by bullets are old in the art. In order to charge defendants with profits received from the use of his device, it was plaintiff's burden to show "the advantage, that is the saving, which the defendant derived from using the plaintiff's invention over what he could derive from using any other process or thing which was known prior to that invention." "The other process or thing mentioned in the rule is called the standard of comparison in the case." [2] Plaintiff wholly failed to sustain that burden. Indeed, he offered no proof from which the profits derived from the use of the invention could be determined. His proof was limited to proof of receipts from the shooting gallery, aided by proof which the master thought sufficient, of the amount of those receipts which were derived from customers who shot at the moving duck pond targets alone. In awarding profits on the basis of that proof, and wholly ignoring the standard of comparison, the master, under a complete misapprehension as to the rule, thought and said that the case was like, and to that extent ruled by, Westinghouse Electric Mfg. Co. v. Wagner, 225 U. S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L. R.A.,N.S., 653, and Decker v. Smith, D. C., 225 F. 776. In the first place those cases had to do with profits from sales and not from use, and were governed by a wholly different rule. In the second place, the facts of those cases were wholly different from the facts of this. The theory upon which profits from infringing uses are recovered is the equitable one that no person should unjustly enrich himself from his wrong of practicing infringement, and that he will be held as trustee of the profits which he derived from such wrongful use. The one who invokes this principle should be prepared to prove the unjust enrichment. It was plaintiff's duty to show that by using his device, defendant made profits which it would not have made if it had used other devices open to it. There is no evidence in the record that any more

[2] Walker on Patents—Deller's Ed. Vol. 3, p. 2206 et seq.; Klooster's "Patent Accounting", pp. 395, 435 and 495; O'Neal v. San Jose Canning Co., 9 Cir., 33 F.2d 892; National Carbon Co. v. Richards & Co., 2 Cir., 85 F.2d 490; Mevs v. Conover, 125 U.S. 144 note, 131 U.S.Append. cxlii, 8 S.Ct. 898 note, 23 L.Ed. 1008; Cambria Iron Co. v. Carnegie Steel Co., 3 Cir., 224 F. 947; Dunkley Co. v. Central California Canneries Co., 9 Cir., 7 F.2d 972.

customers were drawn to the duck gallery by the use of plaintiff's device than would have come if older devices had been used. Neither is there any proof that because of the convenience of its form defendant saved costs and expenses in moving the equipment about or otherwise profited therefrom. In short, the case is entirely devoid of proof upon which a just estimate of profits could be made, and the judgment must be reversed for want of such proof, and the cause remanded for trial anew.

 While, because of the complete reversal on this ground, it is not necessary from the standpoint of the disposition of this appeal to decide the second question presented or the cross-appeal, we think it proper, in view of another trial, to do so. For the reasons above stated, that an award of profits does not proceed upon the theory of reparation or punishment but upon the equitable principle that one who has received an unjust enrichment should be made to disgorge that which he received, the judgment against appellant for profits, admittedly not received by it, was wrong. Nothing more was proven or found than that the defendants were joint tort-feasors, that is, co-infringers that each was a party to, and derived benefits from, the infringement. In patent cases it is well settled that co-infringers, unless they are partners, are severally accountable only for the profits each has received.[3] Here there was no proof or finding that appellant and his co-infringer were partners. Indeed, the proof negatived this relation. There was no sharing of expenses, none of the losses. There was only a payment by Corbett to appellant of a percentage of the gross profits received not from the use of the infringing device as such but from the concessions as a whole.

As to the cross-appeal for treble profits, it is sufficient to say that their disallowance was not error. The statute invoked does not require it, merely allows, increase of damages in the discretion of the court, and nothing is presented to show that that discretion has been abused. But

a second and more fundamental reason is that the basis for such an allowance must be found, if at all, in the statute. 35 U.S.C.A. § 70. An examination of it shows that, throughout, it draws a clear distinction between profits and damages and that the provision relied on for trebling[4] the recovery is precisely limited to recoveries for damages, New England Fibre Blanket Co. v. Portland Telegram, 9 Cir., 61 F.2d 648; Yesbera v. Hardesty Mfg. Co., 6 Cir., 166 F. 120; Overman Cushion Tire Co. v. Goodyear Tire & Rubber Co., 2 Cir., 66 F. 2d 361. The judgment is reversed, and the cause is remanded for further and not inconsistent proceedings.

---

[3] Sammons v. Colonial Press, 1 Cir., 126 F.2d 341; Elizabeth v. Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000; International Radio Tel. Co. v. Atlantic Communication Co., 2 Cir., 290 F. 698.

[4] "And upon such evidence and all other evidence in the record, the court may adjudge and decree the payment by the defendant to the complainant of a reasonable sum as profits or general damages for the infringement. The court shall have the same power to increase such damages, in its discretion, as is given to increase the damages found by verdicts in actions in the nature of actions of trespass upon the case."